STATE of Missouri, Respondent,

v.

Gilbert V. GLENN, Jr., Appellant.

No. 52748.

Supreme Court of Missouri,
Division No. 1.

Feb. 12, 1968.

Norman H. Anderson, Atty. Gen., Jefferson City, Sam F. Hamra, Jr., Special Ass't. Atty. Gen., Springfield, for respondent.

William A. Moon, and Hilderbrandt & Smith, Springfield, for appellant.

HOUSER, Commissioner.

Gilbert V. Glenn, Jr. was charged under the Habitual Criminal Act with grand stealing of a 1965 Ford Mustang automobile. Convicted by a jury and sentenced to 8 years' imprisonment in the custody of the department of corrections, he has appealed.

The State's case tended to show the following: Defendant and his wife Irene, residents of Springfield, were the holders of a certificate of title to the automobile in question. For nearly five years defendant had known one John Davidson, who operated a gasoline filling station, and for a year or two defendant had traded with him. In April, 1966 defendant wanted to sell his Mustang and buy a new car. Davidson, although not a dealer, occasionally bought and sold automobiles. Defendant approached Davidson and asked him to make an offer on the Mustang. Davidson made defendant an offer of $1,550 and told defendant that he would give him a down payment of $50, the balance when defendant's new car was delivered. Defendant asked Davidson if he would make a down payment of $150, that being the sum required as a deposit on the new Oldsmobile he was considering. On April 13 Davidson issued to defendant a check drawn on a Springfield bank for $150 marked "Payment on 65 Mustang Bal. 1400.00." Defendant endorsed and cashed the check. Defendant

did not give Davidson a receipt or "anything in return" for the check. There was an understanding that defendant was to continue to drive the Mustang for ten days or two weeks while the Oldsmobile was on order. On April 25 defendant told Davidson that his new car would arrive on April 27 and asked for Davidson's assurance that the $1,400, would be available "to pay for the car." Davidson gave defendant this assurance and on April 26 Davidson went to his bank, signed a promissory note for $1,100, had the proceeds of the note deposited to his account, and deposited an additional $300 so there would be $1,400 on deposit to cover the check. It was agreed that for the $1,400 defendant would give Davidson title to the Mustang. On April 27 defendant appeared at Davidson's filling station to complete the transaction. Davidson made out a check payable to defendant in the sum of $1,400, and defendant delivered the certificate of title to Davidson.

The certificate of title was regular on its face. On the reverse side, under "Assignment of Title," on the proper line for the signature of the seller, appeared the signatures of defendant and his wife. The assignment bore the signature and seal of a notary public below the recital "Subscribed and sworn to before me this 27 day of August, 1965." It was evident that two names and a Springfield address had been typed in the space provided in the form for name and address of buyer, and that an attempt had been made to erase the names and the street address. The erasure was not complete. The first three letters of the first name of someone ("Gil * *"), the words "and Irene F. Glenn," and an address on "Wayland," were still faintly visible. Defendant explained to Davidson that at the time the notary took the acknowledgment defendant had been trying to sell the automobile; that he "already" had the certificate notarized; that the notary by mistake had placed the names of defendant and his wife in the space provided for the name of the buyer; that defendant had erased the names typed in and that Davidson

could write in his own name in that space. Davidson accepted the title and the explanation. Before handing defendant the check Davidson said, "You will have that car in here this afternoon?" Defendant answered that it might be in the morning, "according to what time we get back." Defendant left the station and endorsed the $1,400 check, which was paid on the same day.

Thereafter on one pretext or another defendant put off the delivery of the automobile from day to day and from time to time. On May 6 Davidson, accompanied by a policeman, went to defendant's home. The Mustang was parked in the yard. Davidson went to the door and rang the doorbell several times. No one answered. Davidson then raised the hood of the Mustang and started to put a "jumper" on the ignition, with the intention of taking possession of the automobile. Defendant appeared and asked what they were doing. The policeman explained that Davidson had come after the automobile which he had purchased and showed defendant the assigned certificate of title. Defendant stated that he had not sold Davidson the car; denied that he, defendant, had made the erasure on the assignment; stated that the title was "no good" because it had been altered; that he had lost the certificate of title in September or October of 1965; that he had kept the certificate in the glove compartment of the automobile "and since Davidson serviced this car for him in the past it was possible for [Davidson] to steal the title out of the glove box." Defendant threatened to have both the policeman and Davidson arrested, and they left. Neither on that day nor at any time thereafter did Davidson gain possession of the automobile. On May 11 or 12 Davidson printed his name in ink in the space on the reverse side of the certificate provided for the name of the buyer.

Two or three days prior thereto, on May 9, 1966, defendant purchased a new 1966 Chrysler from Martin Motor Company, using the Mustang as a trade-in. Defendant at that time assigned to Martin Motor Com-

pany a duplicate certificate of title to the Mustang, dated November 19, 1965. Defendant had applied for a duplicate certificate of title on November 1, 1965, stating in his application that the original title certificate was "lost."

Glenn defended the charge of automobile theft on the theory that at no time had he ever sold or tried to sell the automobile to Davidson; that he had never delivered the certificate of title or the possession of the car to him, and that his dealings with Davidson were solely referable to two loan transactions entered into between the parties. He testified that he borrowed $150 from Davidson and acknowledged that he received a check for that sum, but emphatically denied that the check bore the notation "Payment on 65 Mustang Bal. 1400.00" at the time he received the check. He said he would not have cashed or deposited the check had that notation been on the check. He asserted that he later applied to Davidson for another loan, this time in the amount of $1,100; that Davidson agreed to make the loan but required $300 interest; that when Davidson gave defendant the $1,400 check defendant cashed it and returned $300 in cash to Davidson, according to the understanding; that he gave Davidson a promissory note for $1,550 in April, 1966 in return for these loans. Defendant produced a printed form of promissory note, with the blank spaces filled in on a typewriter. He testified that the original note, of which this was a copy kept by defendant for his records, was executed and delivered by him to Davidson. It was dated "April 1966," and purported to be a promise by G. V. Glenn, Jr. to pay to the order of John L. Davidson $1,550 on demand after date and if no demand is made then on April 28, 1967, with interest "Included."

With respect to the certificate of title, defendant testified that a few months prior to November, 1965 he had been "thinking about another car," and that is when and why he had the original title certificate notarized and "made out" ready for delivery to the purchaser; that after he decided not to get another car he went to the license bureau and asked what to do about it; that he was told that it would not be necessary to send in the certificate of title; that he typed in his name and that of his wife in the space provided for the name of the buyer on the assignment portion on the back side of the certificate and "stuck it in the glove compartment" of his Mustang. He said that a week or so later he looked for but could not find the certificate of title. Assuming that it was lost he made application on November 1, 1965 for a duplicate title. Defendant testified that the first time he saw the old certificate of title after he had put it in the glove compartment was on the day Davidson and the police officer came to try to take possession of the Mustang. Defendant denied that he ever delivered a certificate of title to the Mustang to Davidson.

The case was submitted to the jury under an instruction authorizing a verdict of guilty of grand stealing upon a finding that defendant did wilfully, unlawfully, feloniously and intentionally steal by appropriating the property of John Davidson, to-wit, a 1965 Ford Mustang (described by manufacturer's number) by exercising dominion over the property in a manner inconsistent with the rights of Davidson, without Davidson's consent, in that defendant transferred the Mustang to Martin Motor Company with intent to permanently deprive Davidson of the use thereof, and authorizing an acquittal unless the jury found the facts so to be. No instruction was offered or given submitting the defense that defendant had never sold the automobile to Davidson; that he had never delivered a certificate of title properly executed, nor had defendant otherwise delivered any certificate of title to said automobile to Davidson, and that the negotiations and transactions by and between the parties were restricted to the lending of money by Davidson to defendant and the giving of a promissory note by defendant to Davidson.

Defendant makes three points. First, he contends that a verdict of acquittal should

have been directed in his favor because under all of the evidence Davidson was not the owner of the automobile; that defendant was the owner thereof, and that defendant could not intentionally steal by taking the property of Davidson—could not steal his own property. Second, he complains of the failure to instruct on defendant's theory of defense. Third, he attacks the main verdict-directing instruction on the ground that it assumed that the automobile was the property of Davidson, and that there was no evidence to sustain a finding that Davidson was the owner thereof.

For determination under Point 1 is the validity of an assignment of a certificate of ownership of a motor vehicle under § 301.210, RSMo 1959, V.A.M.S., which provides that in the event of a sale or transfer of a motor vehicle the holder of certificate of ownership "shall indorse on the same an assignment thereof, with warranty of title in form printed thereon, and prescribed by the director of revenue," and deliver the same to the buyer at the time of the delivery to him of the motor vehicle, and that it shall be unlawful to buy or sell any motor vehicle unless at time of delivery there shall pass between the parties such certificate of ownership "with an assignment thereof," and that a sale "without the assignment of such certificate of ownership, shall be fraudulent and void."

■ Section 301.210 is a special statute, a police regulation "of the highest type" with which "absolute technical compliance" is required, the provisions of which are "rigidly enforced" and as to which there are "no exceptions to conform to intentions." Allstate Ins. Co. v. Hartford Acc. & Indemnity Co., Mo.App., 311 S.W.2d 41, 46, fn. 4. The statute is "drastic, mandatory, and intended as a police regulation in the interest of the public welfare to prevent traffic in stolen automobiles," Robertson v. Snider, Mo.App., 63 S.W.2d 508, 509, quoted with approval in Commercial Credit Corp. v. Blau, Mo.Sup., 393 S.W.2d 558, 563; "to aid in the apprehension of criminals, and

to protect the innocent and guileless from the machinations and wiles of the wicked." Evens v. Home Ins. Co. of New York, 231 Mo.App. 932, 82 S.W.2d 111, 116 [2].

Taking the state's evidence at face value; assuming that this was an attempted sale and not merely a loan transaction, and accepting as a fact that defendant on April 27, 1966 for a consideration of $1,550 delivered the certificate of title to Davidson with express authority to insert his name in the space provided in the assignment for the name of the buyer and with the intention of passing title to the Mustang to Davidson, we are of the opinion that the attempted sale was fraudulent and void.

■ The purported assignment of August 27, 1965 did not make good the "sale" of April 27, 1966. In the first place, no sale had occurred on August 27, 1965. Section 301.210 commences with these words: "In the event of a sale or transfer * * *." This clearly expresses the legislative intent that the occurrence of a sale or transfer from the holder of the certificate of ownership to an identified, existing buyer or transferee is a prerequisite to a valid assignment. On August 27, 1965 there had been no "event of a sale" as contemplated by § 301.210. Furthermore, indorsement "[i]n the event of a sale" means indorsement at the time of a sale or so close thereto in point of time as to constitute one single transaction. In this case eight months intervened between the date of the execution of the assignment and the delivery of the certificate of ownership to a buyer. The in-blank assignment of August 25, 1965, eight months before the "sale" and without any existing buyer, was fraudulent and void. Such an in-blank indorsement is precisely the kind of loose practice § 301.210 is designed to prevent.

■ Secondly, a necessary party was missing. An assignment is a contract between two parties, an assignor and an assignee, involving mutual assent, (a meeting of minds), consideration and subject

matter. 6 C.J.S. Assignments § 2, p. 1047. There must be an intention to make a present irrevocable transfer of the subject matter, on the one side, and an assent to receive it, on the other. Jordan v. Harrison & Platt, 46 Mo.App. 172; Miller v. Heisler, Mo.App., 187 S.W.2d 485. When a statute prescribes the necessary parties to an assignment there must be a compliance with the statute in order for an assignment to be valid. Porte v. Chicago & N.W. Ry. Co., 162 Wis. 446, 156 N.W. 469 [3]. Under § 301.210 the necessary parties to an assignment of a certificate of ownership of a motor vehicle are a seller and a buyer. When the purported assignment of August 27, 1965 was made before the notary public there were two assignors but no assignee—no person to give his assent to receive title to the automobile. Nothing in § 301.210 supports the conclusion that a valid assignment can be made by making an assignment in blank to a nonexistent, unascertained, unidentified person at a time before the occurrence of an actual sale. Finally, the "assignors" on August 27, 1965 had no intention of making a present irrevocable transfer to any particular person.

■ Nor did the events of April 27, 1966 operate to pass legal title to the "buyer" Davidson. The delivery on that date of the certificate of ownership was ineffective. The null and void assignment dated August 27, 1965 was not revived or resurrected by the simple act of delivering the certificate to a buyer and the subsequent filling in of the buyer's name in the blank space. A new act of assignment and a new acknowledgment by the notary—a contemporaneous assignment and acknowledgment—were necessary to validate the assignment. The delivery of the certificate with the null and void assignment dated August 27, 1965 had no more vitality and effect than the delivery of a signed but unacknowledged assignment, which has often been held insufficient to vest legal title in the buyer. Pearl v. Interstate Securities Co., 357 Mo. 160, 206 S.W.2d 975; Kahn v.

Lockhart, Mo.App., 392 S.W.2d 30; Allstate Ins. Co. v. Hartford Acc. & Indemnity Co., Mo.App., 311 S.W.2d 41. In the latter case the court said: "Unless and until the assignment of the certificate of title is filled in, acknowledged, and delivered to the purchaser, no title passes." 311 S.W.2d 1. c. 46 [3]. The purported sale of April 27, 1966 was null and void and wholly ineffective to transfer legal title to the Mustang to Davidson.

■ The assignment having been a nullity, and no delivery of the motor vehicle to the buyer having taken place, the title to the automobile never left defendant and wife. They continued to be the owners of the Mustang until they delivered it and passed a properly assigned duplicate certificate of title to Martin Motor Company. John Davidson never acquired title to the property. If the state's evidence is true, defendant's acts were grossly dishonest and flagrantly duplicitous. He may very well have been guilty of a criminal act but on this evidence he cannot be convicted of automobile theft.

■ In thus ruling, we necessarily reject the state's contention, citing Pearl v. Interstate Securities Co., 357 Mo. 160, 206 S.W.2d 975, that Davidson had implied authority to fill in his name as buyer on the assignment. The difference between the cases is that in Pearl there had been an actual sale and an existing, ascertained and identified buyer at the time the assignment was attempted. Not so here. When the assignment in blank was made on August 27, 1965 the name of the buyer was not and could not be filled in because no sale had been made; there was no buyer in existence. The purported assignment was made in advance of a sale, with the intention of filling in the assignee's name when a buyer materialized. As indicated, such an assignment is a nullity which cannot be validated by the mere delivery of the certificate to a subsequent buyer and the post-sale insertion of the name of the buyer as assignee, without a new assignment.

The first point disposes of the case and therefore we do not reach and need not pronounce upon the second and third points.

Judgment reversed and defendant ordered discharged.

WELBORN, C., concurs in result.

HIGGINS, C., concur.

PER CURIAM:

The foregoing opinion by HOUSER, C., is adopted as the opinion of the court.

All of the Judges concur.